UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. **09-CV-61031-Cohn-Seltzer**

FEDERICO LUZZI, by and through
Francesca Luzzi in her capacity as the
Personal Representative of the Estate of Federico Luzzi,
GIORGIO GALIMBERTI, ALESSIO DI MAURO,
POTITO STARACE, and DANIELE BRACCIALI,

       Plaintiffs,

v.

ATP TOUR, INC. and
INTERWETTEN AG,

       Defendants.

_____/

FILED by ___*VT*___ D.C.
ELECTRONIC

**July 13, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### COMPLAINT

FEDERICO LUZZI, by and through Francesca Luzzi in her capacity as the Personal Representative of the Estate of Federico Luzzi, GIORGIO GALIMBERTI, ALESSIO DI MAURO, POTITO STARACE, and DANIELE BRACCIALI (hereinafter sometimes referred to individually as "Luzzi," "Galimberti," "Di Mauro," "Starace," and "Bracciali," respectively, or collectively as the "Professional Tennis Players"), by and through their undersigned counsel, hereby file their Complaint against ATP TOUR, INC. and INTERWETTEN AG (hereinafter sometimes referred to individually as the "Association of Tennis Professionals," and "Interwetten," respectively, or collectively as the "Defendants"), and allege in support thereof as follows:

Parties

1.      Luzzi was a professional tennis player until his untimely death at the age of 28 on October 25, 2008.  Luzzi's estate is currently being administered in Broward County, Florida and Francesca Luzzi is serving as the personal representative of Luzzi's estate.  A true and correct copy of the Letters of Administration are attached hereto as Exhibit "A" and are incorporated herein by this reference.

2.      Galimberti is a professional tennis player, *sui juris*, and resident of Italy.

3.      Di Mauro is a professional tennis player, *sui juris*, and resident of Italy.

4.      Starace is a professional tennis player, *sui juris*, and resident of Italy.

5.      Bracciali is a professional tennis player, *sui juris*, and resident of Italy.

6.      The Association of Tennis Professionals is a Delaware corporation having a principal place of business in St. Johns County, Florida.

7.      Interwetten is a telephone and internet based gambling business headquartered in Vienna, Austria and/or Malta.  Interwetten is subject to the personal jurisdiction of this Court pursuant to *inter alia* Section 48.193 of the Florida Statutes because it tortiously interfered with the advantageous business relationship between Luzzi, Galimberti, Starace, Bracciali and the Association of Tennis Professionals by improperly providing confidential information concerning Luzzi, Galimberti, Starace, and Bracciali to the Association of Tennis Professional in the State of Florida when it knew or should have known that such information would be utilized by the Association of Tennis Professionals in the State of Florida to charge and impose suspensions and/or fines against Luzzi, Galimberti, Starace, and Bracciali for violating the 2007 Official Rulebook.  The Association of Tennis Professionals did in fact utilize the information improperly provided by Interwetten in the State of Florida to charge and impose suspensions

2

GENOVESE JOBLOVE & BATTISTA, P.A. *Attorneys at Law*

and/or fines against Luzzi, Galimberti, Starace, and Bracciali in the State of Florida for violating the 2007 Official Rulebook and therefore the cause of action against Interwetten accrued in the State of Florida. Additionally, Interwetten is subject to the jurisdiction of this Court because Interwetten's website is accessible to residents of the United States for gambling purposes and, upon information and belief, a significant portion of Interwetten's revenue is obtained from credit card companies whose principal place of business is located in the United States and/or from credit card payments which are processed in the United States. Accordingly, the exercise of personal jurisdiction over Interwetten does not offend traditional notions of fair play and substantial justice and otherwise comports with the due process clause of the United States Constitution.

Jurisdiction and Venue

8.      The Court has jurisdiction over Count I of this action pursuant to 28 U.S.C. § 1331 because such cause of action arises under The Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202, and/or pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a state as well as citizens or subjects of a foreign state.

9.      Venue is proper in the Southern District of Florida because this is the District where Luzzi's estate is being administered and where the Association of Tennis Professionals conducts some of its business activities and derives substantial revenue.

THE ASSOCIATION OF TENNIS PROFESSIONALS

10.     The Association of Tennis Professionals was formed in 1972 to give male professional tennis players a voice in the sport of professional tennis and to protect the interests of such players.

3

11.     The Association of Tennis Professionals is a membership organization comprised of individual male tennis players and tennis tournaments that organizes, oversees, sanctions and/or governs, (solely or in conjunction with other entities), the official international circuit of men's professional tennis tournaments known as the ATP (f/k/a the ATP Tour) which includes, but is not limited to, the Grand Slams, Tennis Masters Cup, World Doubles Championship, World Team Championship, ATP Masters Series Tournaments, International Series Gold Tournaments, International Series Tournaments, Challenger Series Tournaments, and Futures Tournaments (hereinafter referred to collectively as the "ATP Events").

12.     The Association of Tennis Professionals currently organizes, oversees, sanctions and/or governs, (solely or in conjunction with other entities), at least 76 tennis tournaments throughout the United States, approximately 28 foreign countries, and in this District.   The Association of Tennis Professionals derives substantial revenue from the operation of its business in this District.

13.     The ATP Events involve the participation of (i) Event Owners who pay the operational expenses for the events (including the prize money payable to the players); (ii) Event Producers who select tournament sites, market the events and raise revenue through sales of sponsorships, tickets, concessions and broadcast rights; and (iii) Sponsors who pay for certain sponsorship rights at the events.

14.     Upon information and belief, total prize money at the various ATP Events ranges from $10,000 for Futures events, $145,000 for a Tier IV Challenger event, to $20 Million for a Grand Slam event.

15.     The Association of Tennis Professionals purports to provide various services to its players/members including, but not limited to, (i) assistance in entering the ATP Events; (ii)

4

collection of prize money; (iii) providing medical and pension benefits; (iv) educating and informing players of its rules, policies, procedures, and penalties; (v) acting as a liaison between players and the Event officials; and (vi) overall player promotion and marketing.

16.     The Association of Tennis Professionals maintains a 52-week rolling ranking system for players (the "ATP Ranking"). A player's ATP Ranking is generally based upon points accumulated by the player through participation in ATP Events and determines the player's seeding and ability to advance in the ATP.

### THE OFFICIAL RULEBOOK AND THE CONSENT FORMS

17.     The Association of Tennis Professionals issues and maintains an "official rulebook" which contains the rules, regulations, policies, procedures, and penalties for players/members in ATP Events (hereinafter referred to as the "Official Rulebook").

18.     The Association of Tennis Professionals attempts to contractually bind the Professional Tennis Players and other players/members to the provisions of the Official Rulebook through a one-page pre-printed, partially completed form written entirely in English and presented to players for their signature shortly before the player's participation in the first ATP Event for the given calendar year (hereinafter the "Consent Forms").

19.     The Consent Forms are misleading because they contain detailed references concerning the Association of Tennis Professionals' Anti-Doping Program and contain only terse, vague and ambiguous references to the Official Rulebook as a whole.

20.     The Professional Tennis Players received the Consent Forms shortly before their participation in the first ATP Event for the pertinent calendar years and believed that the Consent Forms related only to the Association of Tennis Professionals' Anti-Doping Program.

GENOVESE JOBLOVE & BATTISTA, P.A. *Attorneys at Law*

21.     The Professional Tennis Players did not understand the contents or ramifications of executing the Consent Forms because such forms were not translated from English to Italian and the provisions of such form pertaining to their receipt and review of the Official Rulebook were terse, vague and ambiguous.

22.     The Association of Tennis Professionals did not provide, or give an opportunity to review, the Official Rulebook to the Professional Tennis Players at the time it demanded that they execute the Consent Forms.

### THE ANTI-CORRUPTION PROGRAM, ADMINISTRATIVE HEARING OFFICER, WITNESSES, AND GAMBLING COMPANY SPONSORS OF ATP EVENTS

23.     In order to prevent corrupt individuals or organizations from influencing, effecting, or controlling the outcome of ATP Events (e.g., so-called match fixing activities), the Association of Tennis Professionals prohibited its players/members from gambling on tennis or providing inside information concerning the players/members' health condition, weather conditions, court conditions, any other aspect of an ATP Event to non-essential third parties.

24.     Section 7.05 of the 2007 Official Rulebook entitled "Tennis Anti-Corruption Program" (hereinafter the "Anti-Corruption Program") stated as follows:

"(A)     Introduction.

(1)     The purpose of the Tennis Anti-Corruption Program (the "Program") is to maintain the integrity of tennis and to protect against any efforts to impact improperly the results of any match.

(C)     Offenses.  Commission of any offense set forth in Article C or D of this Program or any other violation of the provisions of this Program shall constitute a "Corruption Offense" for all purposes of this Program.

(1)     Wagering.  No player nor any of his Player Support Personnel shall, directly or indirectly, wager or attempt to wager money or anything else of value or enter into any form of financial speculation (collectively, "Wager") on the outcome or any other aspect of any Event."

6

25.     Under the Anti-Corruption Program, the Association of Tennis Professionals'
Administrator Rules and Competition ("ARC") refers the matter to an administrative hearing
officer in situations where the ARC reasonably believes that a player/member has violated the
Anti-Corruption Program.

26.     The rights of a player/member accused of violating the Anti-Corruption Program
are limited under the Anti-Corruption Program to disputing the alleged violations of the Anti-
Corruption Program and to requesting an administrative hearing before the administrative
hearing officer.

27.     Contrary to several statements by the Association of Tennis Professionals and
prior belief of the Professional Tennis Players, the administrative hearing officer charged with
the responsibility of: (i) considering the evidence of an alleged violation of the Anti-Corruption
Program; (ii) determining whether a violation occurred; and (iii) the appropriate punishment, is
not "independent" from the Association of Tennis Professionals.

28.     The administrative hearing officer is actually appointed by the President of the
Association of Tennis Professionals to serve for a term of 2 years, his or her fees and expenses
are paid by the Association of Tennis Professionals, and his or her appointment may thereafter be
renewed in the discretion of the President of the Association of Tennis Professionals.

29.     Upon information and belief, the administrative hearing officer has issued
decisions in favor of the Association of Tennis Professionals in the majority (if not all) of the
administrative proceedings initiated by the Association of Tennis Professionals against
players/members.

30.     At the hearing, the Association of Tennis Professionals is permitted to present the
testimony of individuals, such as the ARC, who have very limited personal knowledge of the

7

underlying facts and the players/members are deprived of their opportunity to confront and cross-examine witnesses with personal knowledge.

31.     After the hearing, the administrative hearing officer is required to issue a decision setting forth his or her findings and setting forth the relief provided.

32.     Under the Anti-Corruption Program, the decision of the administrative hearing officer is deemed to be a full, final, and complete disposition of the matter and may be reported by the Association of Tennis Professionals to the general public.

33.     A player/member who is found to have violated the provisions of the Anti-Corruption Program may be declared ineligible from participation in any competition or match at any ATP Events for a period of up to 3 years and fined up to $100,000 plus an amount equal to the value of any winnings or other amounts received by the player/member in connection with any wager or receipt of consideration.

34.     Additionally, no player/member who has been declared ineligible may, during the period of ineligibility, participate in any capacity in any tournament, competition, event or other activity (other than authorized anti-gambling or anti-corruption education or rehabilitation programs) authorized or organized by the Association of Tennis Professionals.

35.     An ineligible player/member shall also not be given accreditation for, or otherwise granted access to, any competition or event to which access is controlled by the Association of Tennis Professionals, nor shall such player/member be credited with any ATP Entry System Points or ATP Race Points for any competition played during the period of ineligibility.

36.     A player/member who is  declared ineligible from participation in ATP Events and who is fined under the Anti-Corruption Program through the Association of Tennis

Professional's use of a non-independent administrative hearing officer and the lack of a full and fair hearing suffers significant damages to his name, reputation, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

37.    Despite the Association of Tennis Professionals stated zero tolerance policy on gambling by players/members, the Association of Tennis Professionals has knowingly and intentionally organized, overseen, sanctioned and/or governed, (solely or in conjunction with other entities), ATP Events which were sponsored by gambling businesses such as Interwetten, Bet-At-Home, Betfair, and/or Unibet.

### THE 2007 MEMORANDUM OF UNDERSTANDING

38.    Upon information and belief, the Association of Tennis Professionals negotiated and signed a "Memorandum of Understanding" with the European Sports Security Association in or about January 2007 (hereinafter the "2007 Memorandum of Understanding").

39.    Upon information and belief, the 2007 Memorandum of Understanding was understood and intended to serve as a vehicle for the Association of Tennis Professionals to prospectively obtain information and/or documentation concerning large monetary bets (individually or collectively) or highly suspicious betting activities of player/members so that the Anti-Corruption Program could be enforced.

40.    Upon information and belief, the 2007 Memorandum Of Understanding was not understood or intended to be utilized as a vehicle for the Association of Tennis Professionals to retroactively secure the past betting history of players/members like the Professional Tennis

9

Players who merely made nominal or penny-ante bets for entertainment purposes only and who had not engaged in any suspicious betting activities whatsoever.

THE DAVYDENKO – ARGUELLO TENNIS MATCH
AT THE PROKOM OPEN IN SOPOT, POLAND ON AUGUST 2, 2007

41.     On August 2, 2007, Nikolay Davydenko (who then had an ATP Ranking of 5) participated in a tennis match against Martin Vassallo Arguello (who then had an ATP Ranking of 87) at the Prokom Open in Sopot, Poland (the "Davydenko – Arguello Tennis Match").

42.     Despite the significant difference in ATP Rankings, Davydenko was a slight underdog to Arguello immediately prior to the Davydenko – Arguello Tennis Match according to the internet gambling site Betfair.

43.     Oddly, Davydenko was an even greater underdog to Arguello after he won the first set of the Davydenko – Arguello Tennis Match according to Betfair.

44.     Davydenko was then forced to withdraw in the third set of the Davydenko – Arguello Tennis Match due to a foot injury.

45.     Although the Prokom Open was a relatively obscure tournament in relation to the ATP Events and the Davydenko – Arguello Tennis Match was an early round match, it was the subject of an unusually heavy volume of internet gambling.

46.     The unusually heavy volume of internet gambling on the Davydenko – Arguello Tennis Match caused Betfair to void nearly $ 7 Million in bets and the Association of Tennis Professionals to investigate the situation.

47.     The concern was that inside information concerning Davydenko's health condition had been improperly disclosed or that Davydenko had been secretly influenced by corrupt individuals or organizations to "tank" or throw the Davydenko – Arguello Tennis Match.

10

48.     In or about September 2008, Davydenko was cleared of any wrongdoing in connection with the Davydenko – Arguello Tennis Match by the Association of Tennis Professionals.

## THE GUNN-REES REPORT

49.     The highly suspicious betting activity on the Davydenko – Arguello Tennis Match generated widespread media coverage and pressure on the Association of Tennis Professionals to address and resolve the perceived problem of gambling in the sport of professional tennis.

50.     As a result, the Association Of Tennis Professionals (along with the other governing bodies of professional tennis) commissioned experts Ben Gunn and Jeff Rees to conduct a review of perceived threats to the integrity of professional tennis including, match fixing and corrupt betting activities, and to prepare a report of their recommendations and findings.

51.     In May 2008, Gunn and Rees issued their report entitled "Environmental Review Of Integrity In Professional Tennis" (hereinafter the "Gunn-Rees Report").

52.     The Gunn-Rees Report concluded that professional tennis was not institutionally or systematically corrupt and that rumors concerning "Russian or Italian Mafia" involvement in match fixing or other corrupt betting activities were wholly unsubstantiated.

53.     Section 2.6 of the Gunn-Rees Report also acknowledged that disciplinary actions involving violations of the Anti-Corruption Program in the past five years were "limited."

54.     Upon information and belief, wagering or gambling activity on professional tennis by players/members of the Association of Tennis Professional was discovered in the

11

*GENOVESE JOBLOVE & BATTISTA, P.A. Attorneys at Law*

process of preparation of the Gunn-Rees Report and provided as confidential information to the Association Of Tennis Professionals (and other governing bodies).

55.     The Gunn-Rees Report made 15 recommendations to enhance the integrity of professional tennis.

56.     Incredibly, Sections 3.148(viii) and 3.152 through 3.156 and recommendation 15 of the Gunn-Rees Report suggested that internet gambling businesses should be permitted to sponsor tennis matches and/or tournaments through negotiation of a right to bet agreement or sale of sporting rights and that those sponsorship funds should be used to defray the expense of implementing the so-called integrity measures.

## INTERWETTEN

57.     According to its website, Interwetten is one of the leading providers of online sport betting with more than 1,000,000 million registered customers in 200 countries.

58.     Although Las Vegas, Nevada is the only location where gambling is legal in the United States, Section 3.142 of the Gunn-Rees Report acknowledged that one could easily access internet betting sites and place bets on professional tennis throughout the United States.

59.     According to Interwetten's website, Interwetten maintained the betting history of its account holders in strict confidence and agreed not disclose such information to third parties under any circumstances.

60.     Upon information and belief, Interwetten had no obligation to, and did not, disclose the betting history of players/members to the Association of Tennis Professionals prior to 2007.

61.     Upon information and belief, Interwetten's ability to sponsor future ATP Events was a subject of discussion during the negotiation of the 2007 Memorandum of Understanding or

12

in connection with the Association of Tennis Professional's request for information or documentation concerning the Professional Tennis Players.

62.     Upon information and belief, Interwetten's ability to sponsor future ATP Events was considered a *quid pro quo* in exchange for Interwetten's agreement to provide information or documentation concerning players/members to the Association of Tennis Professionals.

63.     Upon information and belief, Interwetten agreed to prospectively provide information and/or documentation concerning large monetary bets (individually or collectively) or highly suspicious betting activities of player/members to the Association of Tennis Professionals in contemplation of Interwetten's future ability to sponsor ATP Events.

64.     Recently, Interwetten sponsored the Interwetten Austrian Open Kitzbuhel, an Association of Tennis Professionals' World Tour 250 tennis tournament.

## THE PROFESSIONAL TENNIS PLAYERS

65.     Upon information and belief, the Association of Tennis Professionals discriminately targeted the Professional Tennis Players for selective enforcement of the Anti-Corruption Program.

66.     Upon information and belief, the Professional Tennis Players were discriminately targeted for selective enforcement of the Anti-Corruption Program in order to pacify the media and the general public that the Association of Tennis Professionals was taking swift and decisive action to enforce the Anti-Corruption Program.

67.     Upon information and belief, the Association of Tennis Professionals did not request information or documentation concerning the wagering or gambling history of each and every player/member from the European Sports Security Association, Betfair, Interwetten, or other gambling businesses pursuant to the 2007 Memorandum of Understanding or otherwise.

13

GENOVESE JOBLOVE & BATTISTA, P.A. *Attorneys at Law*

68.     Upon information and belief, the Association of Tennis Professionals had knowledge of other players/members who had violated the Anti-Corruption Program through, among other sources, confidential information provided in connection with the Gunn-Rees Report but intentionally chose not to commence administrative proceedings against such players/members for undisclosed business reasons.

<u>Luzzi</u>

69.     At all relevant times, Luzzi was a member of the Association Of Tennis Professionals and had a career high ATP Ranking (singles) of 92.

70.     Approximately two months after the Davydenko – Arguello Tennis Match (October 9, 2007), the Association Of Tennis Professionals notified Luzzi that it was commencing an administrative proceeding against him for alleged violations of the Anti-Corruption Program (hereinafter the "Luzzi Notice of Commencement").

71.     The Association Of Tennis Professionals further stated in the Luzzi Notice of Commencement that it had secured Luzzi's online betting history from Interwetten pursuant to the 2007 Memorandum of Understanding and that such history reflected 273 bets placed by Luzzi in the period May 4, 2004 through April 19, 2007.

72.     Significantly, Luzzi's betting history reflected the opening of an account in his own name with Interwetten on or about March 26, 2004 (the "Luzzi Interwetten Account"), a bank account in Luzzi's own name was linked with the Luzzi Interwetten Account, the placement of *only* penny-ante or nominal bets in the Luzzi Interwetten Account for entertainment purposes only ("small stakes" according to Interwetten), and Interwetten's finding that there was "no suspicious betting behavior" in the Luzzi Interwetten Account.

14

73.     Luzzi requested an administrative hearing concerning the alleged violations of the Anti-Corruption Program and such hearing was held before the Association Of Tennis Professionals' administrative hearing officer in Jacksonville, Florida on or about January 28, 2008.

74.     On February 29, 2008, the Association Of Tennis Professionals' administrative hearing officer issued a decision declaring Luzzi ineligible for a duration of 200 days from participation in any competition or match at any ATP tournament, competition or other event or activity authorized or organized by the ATP and imposing a fine of $50,000.

75.     The suspension and fine imposed by the Association of Tennis Professionals on Luzzi caused extreme financial, emotional and psychological harm and injury including, but not limited to, extreme anxiety over his inability to perform, significant damages to Luzzi's name, reputation, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

<u>Galimberti</u>

76.     At all relevant times, Galimberti was a member of the Association Of Tennis Professionals and had a career high ATP Ranking (singles) of 115.

77.     Approximately two months after the Davydenko – Arguello Tennis Match (October 9, 2007), the Association Of Tennis Professionals notified Galimberti that it was commencing an administrative proceeding against him for alleged violations of the Anti-Corruption Program (hereinafter the "Galimberti Notice of Commencement").

15

78.     The Association Of Tennis Professionals further stated in the Galimberti Notice of Commencement that it had secured Galimberti's online betting history from Interwetten pursuant to the 2007 Memorandum of Understanding and that such history reflected approximately 401 bets related to approximately 1,796 tennis matches placed by Galimberti in the period June 11, 2003 through January 12, 2006.

79.     Significantly, Galimberti's betting history reflected the opening of an account in his own name with Interwetten on or about June 11, 2003 (the "Galimberti Interwetten Account"), a bank account in Galimberti's own name was linked with the Galimberti Interwetten Account, the placement of *only* penny-ante or nominal bets in the Luzzi Interwetten Account for entertainment purposes only ("medium stakes" according to Interwetten), and Interwetten's finding that there was "no suspicious betting behavior" in the Galimberti Interwetten Account.

80.     Galimberti requested an administrative hearing concerning the alleged violations of the Anti-Corruption Program and such hearing was held before the Association Of Tennis Professionals' Administrative Hearing Officer in Jacksonville, Florida on or about January 28, 2008.

81.     On February 15, 2008, the Association Of Tennis Professionals' Administrative Hearing Officer issued a decision declaring Galimberti ineligible for a duration of 100 days from participation in any competition or match at any ATP tournament, competition or other event or activity authorized or organized by the ATP and imposing a fine of $35,000.

82.     The suspension and fine imposed by the Association of Tennis Professionals on Galimberti has caused extreme financial, emotional and psychological harm and injury including, but not limited to, extreme anxiety over his inability to perform, significant damages

16

GENOVESE JOBLOVE & BATTISTA, P.A. *Attorneys at Law*

to Galimberti's name, reputation, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

### Di Mauro

83.    At all relevant times, Di Mauro was a member of the Association Of Tennis Professionals and had a career high ATP Ranking (singles) of 68.

84.    Approximately one month after the Davydenko – Arguello Tennis Match (in or about September 2007), the Association Of Tennis Professionals notified Di Mauro that it was commencing an administrative proceeding against him for alleged violations of the Anti-Corruption Program (hereinafter the "Di Mauro Notice of Commencement").

85.    The Association Of Tennis Professionals further stated in the Di Mauro Notice of Commencement that it had secured Di Mauro's online betting history from a confidential informant and/or Unibet pursuant to the 2007 Memorandum of Understanding and that such history reflected approximately 120 bets related to approximately 338 tennis matches placed by Di Mauro in the period November 2, 2006 through June 12, 2007.

86.    Significantly, Di Mauro's betting history reflected the opening of an account in his own name with Unibet (the "Di Mauro Unibet Account"), a bank account in Di Mauro's own name was linked with the Di Mauro Unibet Account, the placement of *only* penny-ante or nominal bets for entertainment purposes only and no suspicious betting behavior in the Di Mauro Unibet Account.

17

87.     Di Mauro requested an administrative hearing concerning the alleged violations of the Anti-Corruption Program and such hearing was held before the Association Of Tennis Professionals' administrative hearing officer in London, England on or about November 1, 2007.

88.     On November 9, 2007, the Association Of Tennis Professionals' administrative hearing officer issued a decision declaring Di Mauro ineligible for a period of 9 months from participation in any competition or match at any ATP tournament, competition or other event or activity authorized or organized by the ATP and imposing a fine of $60,000.

89.     The suspension and fine imposed by the Association of Tennis Professionals on Di Mauro has caused extreme financial, emotional and psychological harm and injury including, but not limited to, extreme anxiety over his inability to perform, significant damages to Di Mauro's name, reputation, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

<u>Starace</u>

90.     At all relevant times, Starace was a member of the Association Of Tennis Professionals and had a career high ATP Ranking (singles) of 28.

91.     Approximately one month after the Davydenko – Arguello Tennis Match (in or about September 2007), the Association Of Tennis Professionals notified Starace that it was commencing an administrative proceeding against him for alleged violations of the Anti-Corruption Program (hereinafter the "Starace Notice of Commencement").

18

92.     The Association Of Tennis Professionals further stated in the Starace Notice of Commencement that it had secured Starace's online betting history from Interwetten pursuant to the 2007 Memorandum of Understanding and that such history reflected approximately 5 bets related to 16 tennis matches placed by Starace in the period February 21, 2006 through May 23, 2006 and 1 bet placed by Starace on July 11, 2006.

93.     Significantly, Starace's betting history reflected the opening of an account in his own name with Interwetten on or about April 9, 2005 (the "Starace Interwetten Account"), a bank account in Starace's own name was linked with the Starace Interwetten Account, the placement of *only* penny-ante or nominal bets in the Starace Interwetten Account for entertainment purposes only ("small stakes" according to Interwetten), and Interwetten's finding that there was "no suspicious betting behavior" in the Starace Interwetten Account.

94.     On December 21, 2007, the Association Of Tennis Professionals' administrative hearing officer issued a decision declaring Starace ineligible for the period December 31, 2007 through February 10, 2008 from participation in any competition or match at any ATP tournament, competition or other event or activity authorized or organized by the ATP and imposing a fine of $30,000.

95.     The suspension and fine imposed by the Association of Tennis Professionals on Starace has caused extreme financial, emotional and psychological harm and injury including, but not limited to, extreme anxiety over his inability to perform, significant damages to Starace's name, reputation, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

19

<u>Bracciali</u>

96.     At all relevant times, Bracciali was a member of the Association Of Tennis Professionals and had a career high ATP Ranking (singles) of 49.

97.     On October 18, 2007, the Association Of Tennis Professionals notified Bracciali that it was commencing an administrative proceeding against him for alleged violations of the Anti-Corruption Program (hereinafter the "Bracciali Notice of Commencement").

98.     The Association Of Tennis Professionals further stated in the Bracciali Notice of Commencement that it had secured Bracciali's online betting history from Interwetten pursuant to the 2007 Memorandum of Understanding and that such history reflected 60 bets related to 258 tennis matches placed by Bracciali in the period May 17, 2004 through January 24, 2005.

99.     Significantly, Bracciali's betting history reflected the opening of an account in his own name with Interwetten on or about May 17, 2004 (the "Bracciali Interwetten Account"), a bank account in Bracciali's own name was linked with the Bracciali Interwetten Account, the placement of *only* penny-ante or nominal bets in the Bracciali Interwetten Account for entertainment purposes only ("small stakes" according to Interwetten), and Interwetten's finding that there was "no suspicious betting behavior" in the Bracciali Interwetten Account.

100.    On December 21, 2007, the Association Of Tennis Professionals' Administrative Hearing Officer issued a decision declaring Bracciali ineligible for the period December 31, 2007 through March 30, 2008 from participation in any competition or match at any ATP tournament, competition or other event or activity authorized or organized by the ATP and imposing a fine of $20,000.

101.    The suspension and fine imposed by the Association of Tennis Professionals on Bracciali has caused extreme financial, emotional and psychological harm and injury including,

20

but not limited to, extreme anxiety over his inability to perform, significant damages to Bracciali's name, reputation, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

102.    The administrative proceedings initiated by the Association of Tennis Professionals against the Professional Tennis Players, suspensions, and fines for violations of the Anti-Corruption Program improperly fueled rumors and speculation that the "Mafia" was involved in match-fixing and/or corrupt betting activities.

103.    The Gunn-Rees report dismissed such rumors and speculation as completely unfounded.

104.    Despite the fact that the Association Of Tennis Professionals based the administrative proceedings, suspensions and fines against the Professional Tennis Players upon information it secured from Interwetten and Unibet pursuant to the 2007 Memorandum of Understanding, the Association of Tennis Professionals failed and/or refused to provide or disclose the 2007 Memorandum of Understanding to the Professional Tennis Players.

105.    As evidenced by the Professional Tennis Players' failure to conceal or misrepresent their identity in the establishment and use of their online betting accounts, they believed that only match-fixing or corrupt betting activities were prohibited by the Anti-Corruption Program and not their penny-ante or nominal betting activities for entertainment purposes only.

21

GENOVESE JOBLOVE & BATTISTA, P.A. *Attorneys at Law*

106.   The Professional Tennis Players' belief as stated hereinabove at paragraph 105 was formed because of the terse Consent Forms, the manner and means in which the Consent Forms were presented to the Professional Tennis Players for execution, and the failure of the Association of Tennis Professionals to provide, or give such players/members an opportunity to review, the Official Rulebook.

107.   All conditions precedent to the institution of this action have been performed, have occurred, have been waived or have otherwise been excused.

108.   The Professional Tennis Players have retained the undersigned attorneys to represent them in this action and has agreed to pay them a reasonable fee for their services.

COUNT I
DECLARATORY JUDGMENT ACTION AGAINST THE ASSOCIATION OF TENNIS
PROFESSIONALS PURSUANT TO THE DECLARATORY JUDGMENT ACT, 28 U.S.C. §§
2201 – 2202 AND/OR CHAPTER 86 OF THE FLORIDA STATUTES

109.   The Professional Tennis Players repeat and reallege each and every allegation set forth in paragraphs 1 through 108 of their Complaint as if set forth at length herein.

110.   The Association of Tennis Professionals has contended that the Official Rulebook constitutes a contract between it and the Professional Tennis Players because the Professional Tennis Players executed the Consent Forms.

111.   As noted hereinabove, the Consent Forms are a one-page pre-printed, partially completed form written entirely in English and which is hurriedly presented to players for their signature shortly before the player's participation in the first ATP Event for the given calendar year.

112.   The Association of Tennis Professionals did not furnish a copy of, or allow review of, the Official Rulebook by the Professional Tennis Players in conjunction with, or prior to, execution of the Consent Forms.

22

113.    The Consent Forms are also misleading because they contain detailed references concerning the Association of Tennis Professionals' Anti-Doping Program and contain only terse, vague and ambiguous provisions concerning the players/members receipt and review of the Official Rulebook.

114.    If the elements to formation of a valid and binding contract are present by reference to the Official Rulebook, the Consent Forms, and applicable law, the Professional Tennis Players were bound by the Anti-Corruption Program whether they had knowledge of it or not.

115.    However, if the elements to the formation of a valid and binding contract are not present by reference to the Official Rulebook, the Consent Forms, and applicable law, the Professional Tennis Players were not bound by the Anti-Corruption Program and the suspensions and fines imposed by the Association of Tennis Professionals would have been improper.

116.    The Association of Tennis Professionals has also taken the position that the Professional Tennis Players received a full and fair hearing concerning alleged violations of the Anti-Corruption Program.

117.    As set forth in the 2007 Official Rulebook, however, the administrative hearing officer is not independent because he or she is appointed by the President of the Association of Tennis Professionals and his or her fees and expenses are paid by the Association of Tennis Professionals.

118.    In addition, the Association of Tennis Professionals is permitted to present the testimony of individuals, such as the ARC, who have very limited personal knowledge of the underlying facts and the players/members are deprived of their opportunity to confront and cross-examine purported confidential informants and other witnesses with personal knowledge.

23

119.    The Professional Tennis Players contend that they were deprived of a full and fair hearing concerning alleged violations of the Anti-Corruption Program and such procedures resulted in the preordained outcome of their suspensions and fines by the Association of Tennis Professionals.

120.    The Association of Tennis Professionals contend that they were permitted to utilize the 2007 Memorandum of Understanding as a vehicle to retroactively obtain information and/or documentation concerning the Professional Tennis Players wagering activities prior to 2007 and utilize such information and documentation in connection with the administrative proceeding concerning the alleged violation of the Anti-Corruption Program.

121.    The Professional Tennis Players contend that the Association of Tennis Professionals was not permitted to utilize the 2007 Memorandum of Understanding as a vehicle to retroactively obtain information and/or documentation concerning the Professional Tennis Players' wagering activities prior to 2007 and was not permitted to utilize such information and documentation in connection with the administrative proceeding concerning the alleged violation of the Anti-Corruption Program.

122.    Despite the fact that the Association of Tennis Professionals based its administrative proceedings, suspensions and fines against the Professional Tennis Players upon information and/or documentation obtained pursuant to the 2007 Memorandum of Understanding, it failed and/or refused to provide a copy of the 2007 Memorandum of Understanding to the Professional Tennis Players.

123.    The Professional Tennis Players maintain that they are entitled to receive and review a copy of the 2007 Memorandum of Understanding upon which the administrative proceedings, suspensions and fines were based.

24

124.    There is thus a bona fide, actual, and present practical need for a judicial declaration concerning (i) whether a contract was formed between the Association of Tennis Professionals and the Professional Tennis Players based upon the Official Rulebook, the Consent Forms, and applicable law; (ii) whether the Professional Tennis Players received a full and fair hearing concerning alleged violations of the Anti-Corruption Program; (iii) whether the 2007 Memorandum of Understanding could be used as a vehicle to retroactively obtain information and/or documentation concerning the Professional Tennis Players' past wagering activities prior to 2007; and (iv) whether the Association of Tennis Professionals could utilize information and/or documentation obtained pursuant to the 2007 Memorandum of Understanding and refuse to provide the 2007 Memorandum of Understanding to the Professional Tennis Players.

125.    The rights and obligations of the Association of Tennis Professionals and the Professional Tennis Players are in dispute.

126.    The declarations deal with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

127.    The Professional Tennis Players' rights, title, interest, powers and privileges are dependent upon an ascertainment of their rights and obligations.

128.    The Professional Tennis Players and the Association of Tennis Professionals have, or reasonably may have, an actual, present, adverse and antagonistic interest with respect to their rights and obligations.

129.    The antagonistic and adverse interests of the Professional Tennis Players and the Association of Tennis Professionals are all before the Court and the relief sought does not constitute judicial legal advice or questions of curiosity.

25

130.   The Court has the power to enter a declaratory judgment determining the rights and obligations of the parties pursuant to The Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202, and/or Sections 86.011 and 86.031 of the Florida Statutes.

**WHEREFORE**, the Professional Tennis Players respectfully request this Honorable Court to enter a declaratory judgment determining the rights and obligations of the parties and such other and further relief as the Court may deem just and proper.

### COUNT II – BREACH OF FIDUCIARY DUTY AGAINST THE ASSOCIATION OF TENNIS PROFESSIONALS

131.   The Professional Tennis Players repeat and reallege each and every allegation set forth in paragraphs 1 through 108 of their Complaint as if set forth at length herein.

132.   The Association of Tennis Professionals owed a fiduciary duty to the Professional Tennis Players and a relationship of trust existed between them.

133.   The Professional Tennis Players trusted that the Association of Tennis Professionals would not (i) seek to contractually bind them to provisions of the Official Rulebook based upon the content of the Consent Forms or the manner and means in which it was presented for execution; (ii) discriminately target them for selective enforcement of the Anti-Corruption Program; (iii) would give them a full and fair hearing for violations of the Anti-Corruption Program through, at a minimum, use of an independent hearing officer who was not appointed or compensated by the Association of Tennis Professionals, the right to require witnesses to have personal knowledge of the underlying facts and the ability to confront and cross-examine witnesses including purported confidential informants and other witnesses with personal knowledge; (iv) would not use the 2007 Memorandum of Understanding as a vehicle to retroactively obtain information and/or documentation concerning the Professional Tennis Players' past wagering activities prior to 2007 and utilize such information and documentation in

26

connection with the administrative proceeding concerning the alleged violation of the Anti-Corruption Program; (v) would not base violations, suspensions or fines related to the Anti-Corruption Program upon information obtained pursuant to the 2007 Memorandum of Understanding without providing them with a copy of the 2007 Memorandum of Understanding; and (vi) would not impose grossly disproportionate suspensions or fines to violations of the Anti-Corruption Program.

134.    The Association of Tennis Professionals breached their fiduciary duty to the Professional Tennis Players by (i) seeking to contractually bind them to provisions of the Official Rulebook despite the content of the Consent Forms and the manner and means in which they were presented for execution; (ii) discriminately targeting them for selective enforcement of the Anti-Corruption Program; (iii) failing to give them a full and fair hearing for violations of the Anti-Corruption Program by utilizing an administrative hearing officer who was appointed by the President of the Association of Tennis Professionals, permitting them to present witnesses, such as the ARC, who had very little personal knowledge of the underlying facts, depriving the Professional Tennis Players of their right to confront and cross-examine purported confidential informants and other witnesses with personal knowledge; (iv) use of the 2007 Memorandum of Understanding as a vehicle to retroactively obtain information and/or documentation concerning the Professional Tennis Players' past wagering activities prior to 2007 and utilizing such information and documentation in connection with the administrative proceeding concerning the alleged violation of the Anti-Corruption Program; (v) basing violations, suspensions or fines related to the Anti-Corruption Program upon information obtained pursuant to the 2007 Memorandum of Understanding without providing the Professional Tennis Players with a copy

27

of the 2007 Memorandum of Understanding; and (vi) imposing grossly disproportionate suspensions or fines to violations of the Anti-Corruption Program.

135.   The breaches of fiduciary duty by the Association of Tennis Professionals has caused extreme financial, emotional and psychological harm and injury including, but not limited to, extreme anxiety over their inability to perform, significant damages to the Professional Tennis Players' names, reputations, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

136.   The breaches of fiduciary duty by the Association of Tennis Professionals were the proximate cause of the damages suffered by the Professional Tennis Players.

**WHEREFORE**, the Professional Tennis Players demand judgment for compensatory, special, and consequential damages, as well as taxable costs against the Association of Tennis Professionals and for such other and further relief as the Court may deem just and proper.

## COUNT III - TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS AGAINST INTERWETTEN

137.   The Professional Tennis Players repeat and reallege each and every allegation set forth in paragraphs 1 through 108 of their Complaint as if set forth at length herein.

138.   Interwetten had knowledge of the Professional Tennis Players ongoing business relationship with the Association of Tennis Professionals, Event Owners, Event Producers, and Sponsors.

GENOVESE JOBLOVE & BATTISTA, P.A. *Attorneys at Law*

139.   Interwetten agreed to maintain the wagering activities of the Professional Tennis Players in strict confidence and agreed not disclose such information to third parties under any circumstances.

140.   Interwetten was not required to retroactively provide information or documentation concerning the Professional Tennis Players' past wagering activities prior to 2007 to the Association of Tennis Professionals pursuant to the 2007 Memorandum of Understanding.

141.   Interwetten knowingly, willfully, intentionally, and maliciously provided information or documentation concerning the Professional Tennis Players' past wagering activities prior to 2007 to the Association of Tennis Professionals.

142.   Upon information and belief, Interwetten provided information or documentation concerning the Professional Tennis Players' past wagering activities prior to 2007 to the Association of Tennis Professionals in an effort to secure sponsorship opportunities for Interwetten at the ATP Events.

143.   Interwetten lacked any justification or privilege for its actions.

144.   Interwetten's actions have caused extreme financial, emotional and psychological harm and injury including, but not limited to, extreme anxiety over their inability to perform, significant damages to the Professional Tennis Players' names, reputations, good will, loss of existing and potential sponsorship funds and contracts, loss of existing and potential employment opportunities, loss of career advancement opportunities, loss of potential prize money, loss of alternative employment opportunities related to the sport of professional tennis, and other significant compensatory, special and consequential damages.

**WHEREFORE**, the Professional Tennis Players demand judgment for compensatory, special, and consequential damages, as well as taxable costs against Interwetten and for such other and further relief as the Court may deem just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues in this action so triable.

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for the Plaintiff
200 East Broward Boulevard, Suite 1110
Fort Lauderdale, Florida  33301
Telephone: (954) 453-8000
Telecopier: (954) 453-8010

By: _____
    Robert F. Elgidely, Esq.
    Florida Bar No. 111856

- and –

PROF. AVV. CIRO PELLEGRINO
Studio Legale Pellegrino
Palazzo Balestra
Piazza SS. Apostoli, 49
00187 Roma
Telephone: 06 97 616 555
Telecopier: 06 45 556 748

30

A TRUE COPY
HOWARD C. FORMAN

IN THE CIRCUIT COURT FOR
BROWARD COUNTY, FLORIDA

PROBATE DIVISION

IN RE:        ESTATE OF

FEDERICO LUZZI,

Deceased.

File Number _09 0 0 1 8 9 0_

Division: Probate

*Text in left margin (rotated):* Upon entry to a safe deposit box, an inventory of the contents must be made in the presence of a bank employee witnessed, and filed with the court.

*Text in left margin (rotated, bold):* THIS ESTATE MUST BE CLOSED WITHIN 12 MONTHS, NOT CONTESTED.

**LETTERS OF ADMINISTRATION**
(single personal representative)

TO ALL WHOM IT MAY CONCERN

WHEREAS, FEDERICO LUZZI, a resident of Arezzo, Italy, died on October 25, 2008, owning assets in the State of Florida; and

WHEREAS, FRANCESCA LUZZI has been appointed Personal Representative of the Estate of the Decedent and has performed all acts prerequisite to issuance of Letters of Administration in the Estate.

NOW, THEREFORE, I, the undersigned Circuit Court Judge, declare FRANCESCA LUZZI duly qualified under the laws of the State of Florida to act as Personal Representative of the Estate of FEDERICO LUZZI, deceased, with full power to administer the Estate according to law; to ask, demand, sue for, recover and receive property of the Decedent; to pay the debts of the Decedent as far as the assets of the Estate will permit and the law directs; and to make distribution of the Estate according to law.

ORDERED on _____Mag 6_____, 2009.

_____
Circuit Court Judge

*Text in right margin (rotated):* HOWEVER THERE SHALL BE NO SALE OR TRANSFER OF ANY PROPERTY REAL OR PERSONAL WITHOUT FURTHER COURT ORDER or chose in action

LL 2006845-1

EXHIBIT
"A"

**JS 44** (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

Federico Luzzi, Giorgio Galimberti, Alessio Di Mauro, Potito Starace, and Daniele Bracciali,

**DEFENDANTS**

ATP Tour, Inc. and Interwetten AG

**(b)** County of Residence of First Listed Plaintiff   Estate - Broward County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Robert F. Elgidely, Esq., Genovese, Joblove & Battista, P.A., 200 East Broward Boulevard, Suite 1110, Fort Lauderdale, FL 33301, (954) 453-8000

Attorneys (If Known)

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☑ 4  Diversity
(Indicate Citizenship of Parties in Item III)

0: 09 CV 61031-Cohn Seltzer

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                   and One Box for Defendant)

|                                | PTF | DEF |                                                              | PTF | DEF |
|--------------------------------|-----|-----|--------------------------------------------------------------|-----|-----|
| Citizen of This State          | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State    | ☐ 4 | ☑ 4 |
| Citizen of Another State       | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation                                       | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | |
| | Employment | ☐ 550 Civil Rights | Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | |
| | Other | | Detainee | | ☐ 950 Constitutionality of State |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | Statutes |
| | | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed- (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).**
(See instructions second page:)

a) Re-filed Case ☐ YES ☑ NO   b) Related Cases ☐ YES ☑ NO

JUDGE _____   DOCKET NUMBER _____

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. Secs. 2201 - 2201 and 28 U.S.C. Sec. 1332(a)(2) - Claims for Declaratory Judgment, Breach of Fiduciary Duty and Tortious Interference with Advantageous Business Relationships

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE July 13, 2009

FOR OFFICE USE ONLY

AMOUNT _____   RECEIPT # _____   IFP _____

546819