**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FEDERICO LUZZI, et al.,

                    Plaintiffs,

vs.                                               Case No. 3:09-cv-1155-J-32MCR

ATP TOUR, INC.,

                    Defendant.

_____

## ORDER

In the wake of their suspensions following their admissions that they bet on tennis matches, Plaintiffs, professional tennis players Giorgio Galimberti, Alessio Di Mauro, Potito Starace, Daniele Bracciali and Federico Luzzi (by his estate), sue Defendant, ATP Tour, Inc., the governing body of men's professional tennis. (Doc. 1). Plaintiffs seek a declaration as to whether they were contractually bound to ATP's Rulebook, which prohibits such wagering, and whether the resolutions of their cases, which were ostensibly administered within the guidelines of the ATP Rulebook, were full, fair, and binding. Plaintiffs also seek a judgment against ATP for breach of the fiduciary duties Plaintiffs allege they were owed by ATP.

This case is before the Court on ATP's Motion for Summary Judgment. (Doc. 87). Plaintiffs responded and ATP replied. (Docs. 114, 116). The Court held oral argument on December 2, 2010, and the transcript is incorporated by reference. (Doc. 136).

I.    **Facts:**

Plaintiffs are Italian professional tennis players. All played ATP events and held ATP rankings. In 2007, all five were charged by ATP with violations of what ATP calls the "Anti-

Corruption Program." (Doc. 88, Bradshaw Aff., Exs. 1, 10, 16, 24, 27).  Specifically, ATP alleged that these players had engaged in wagering on the outcome of tennis matches, which is a violation of the ATP Official Rulebook (the Rulebook). Id.; (see also Doc. 89, Young Aff., Ex. C at 7.05(C)(1)(a)).

Plaintiffs maintain, and the summary judgment record supports, that players were given consent forms to sign before their first ATP match of a given year. (Doc. 88, Exs. 30-34).  Signing the form was required before a player could set foot on the tennis court. (Doc. 89 at ¶ 9).  A player who signed purported to warrant that he had received and reviewed the ATP Rules, which were composed of both the Rulebook and the ATP By-Laws. (Docs. 88, Exs. 30-34; 89 at ¶¶9).  The player also agreed to comply with and be bound by all of the ATP Rules. (Docs. 88, Exs. 30-34; 89 at ¶¶ 9-10).  The consent form and the ATP Rulebook were produced exclusively in English, and no hard copies of the books were provided to the players at the time of signing. (Doc. 105-1, Bradshaw Dep. at 57, 70, 135).  Though the Rulebook was available on the ATP website and copies were, along with consent forms, occasionally sent out by mail, in practice, the players were often asked to sign the consent form immediately before a match with little or no opportunity for a player (especially one who cannot read the English language) to appreciate what he was signing. (Docs. 107-1, Kegler Dep. at 80-81; 108-1, Warwin Dep. at 43-44; 101-1, Galimberti Dep. at 21-22, 45-46, 120-21, 132-33).[1]

Under a "Memorandum of Understanding" with certain betting companies and the

---

[1] The sealed internal e-mails of ATP also strongly support this view of the way these contracts typically were signed.

European Sports Security Association, in 2003 to early 2007, ATP obtained information on betting accounts that it suspected of being held by tennis players. (Doc. 106-1, Young Dep. at 80-96).  If an account revealed betting activity on tennis and could also be reliably connected to the tennis player suspected of owning the account, that player became the subject of formal ATP proceedings.

The proceedings were to consist of the right to a hearing before a person ATP characterized as an "independent" hearing officer, or, more formally, the Anti-Corruption Hearing Officer of ATP Tour.  In Plaintiffs' cases, this was Dr. Peter Bratschi. (Doc. 106-1 at 106).  Plaintiffs question whether Bratschi was independent because he acted briefly as an attorney for ATP in the past, was appointed by the President of ATP, and was paid by ATP to act as the hearing officer.  Id. at 106-07, 113.  Though Bratschi did not disclose his prior dealings with ATP  (and perhaps he should have), his appointment and payment by ATP were in accord with the Rulebook.[2]  At a proceeding before Bratschi, a player could be, and all Plaintiffs were, represented by their own counsel. (See, e.g., Doc. 88, Exs. 5, 12, 17, 25, 29).  If the results of the hearing before Bratschi were unsatisfactory, the player enjoyed a right to an entirely de novo hearing before the Court of Arbitration for Sport (CAS) in Lausanne, Switzerland, where his claim would be heard by a panel of three arbitrators: one appointed by ATP, one appointed by the player, and one member of the CAS. (Doc. 89, Ex.

---

[2] The Rulebook provides for the Hearing Officer's appointment and makes him responsible for "the overall operation and administration of [the Anti-Corruption] Program." While the Rulebook doesn't directly speak to his pay, it seems obvious that the ATP would pay Bratschi to administer ATP's program.  The Rulebook also provides, however, that the hearing officer will be "otherwise independent from the ATP."  (Doc. 89, Ex. C at 7.05(E)(1)).

3

E at R48, R50, R53-54, R57).

On July 25, 2007, ATP notified Di Mauro of proceedings against him for violation of the Anti-Corruption Program. (Doc. 88, Ex. 1). Through counsel, Di Mauro answered the charges on September 18, 2007, and admitted to having bet on tennis matches. (Doc. 88, Ex. 3 at 2). He emphasized the small nature of the bets, that the bets were on a variety of sports, that he never bet on matches in which he was playing, that the bets were placed openly with no attempt at secrecy, and that, overall, he lost money. Id. In short, Di Mauro admitted knowing that "ATP rules forbid wagering not only on the outcome but also on 'any other aspect of the game'" but essentially maintained that his behavior, while foolish, was not corrupt or aimed at influencing the outcome of tennis matches and thus should not be harshly punished. Id. at 3. Di Mauro's second reply again emphasized his admission to the offense itself, and argued for leniency on the same grounds with an additional plea for consideration given Di Mauro's age and the fact that a lengthy suspension would effectively end his career. (Doc. 88, Ex. 4 at 3). Di Mauro, with counsel, participated in a hearing before Bratschi. (Doc. 88, Ex. 6). Bratschi criticized ATP for not providing sufficient notice of the rules to players, particularly those like Di Mauro who did not understand English well. (Id. at ¶¶ 23-24, 29-30). However, Bratschi nonetheless imposed a suspension of 9 months and a fine of $60,000. (Id. at ¶ 35). On November 9, 2007, the decision was sent via e-mail to Di Mauro's attorneys.

On November 29, 2007, Di Mauro sought review by the CAS. (Doc. 88, Ex. 7). Both parties appointed one arbitrator to a three person panel to hear the claim. (Doc. 88, Ex. 8 at 1). The CAS panel reiterated Bratschi's concerns about the rules being published only in

4

English and likewise agreed that Di Mauro did not intend to "attack the integrity of tennis." (Doc. 88, Ex. 9 at ¶¶ 9.5, 9.9).  The panel reviewed the punishments Bratschi had given to other offending tennis players and elected to reduce Di Mauro's suspension to 7 months and his fine to $25,000.  (Doc. 88-1, Ex. 9).  The decision was sent by fax to Di Mauro's attorneys on June 11, 2008.

ATP notified Galimberti of a proceeding against him on October 9, 2007. (Doc. 88, Ex. 10).  Like Di Mauro, Galimberti was represented by counsel and sought and received a hearing before Bratschi. (Doc. 88, Ex. 15).  Galimberti admitted betting and even admitted betting on his own matches. (Doc. 88, Exs. 13 at 4, 14 at 4).  However, he raised many of the same arguments as Di Mauro and, in addition, protested that he was not a regular member of ATP, that he had voluntarily ceased wagering, and that the information against him (other than his own admissions) had been obtained in violation of his right to privacy. (Doc. 88, Exs. 13 at 2, 14 at 3, 15 at ¶ 62).  On February 15, 2008, Bratschi rendered, and delivered to Galimberti's counsel by e-mail, a decision fining Galimberti $35,000 and suspending him for 100 days. (Doc. 88, Ex. 15 at ¶ 74).  As with Di Mauro, Bratschi made clear that Galimberti was negligent but intended no harm to the sport of tennis by his actions. (Id. at ¶¶ 63-70).  Galimberti did not seek review before the CAS.

Luzzi also was notified on October 9, 2007 of a proceeding against him.  (Doc. 88, Ex. 16).  Through counsel, Luzzi admitted to wagering and presented substantially the same mitigating circumstances as Di Mauro and Galimberti (e.g., the small size of the bets, the openness of the betting, the language barrier to understanding what was prohibited, and the fact that he lost money on most of the bets). (Doc. 88, Ex. 19, 20).  Luzzi also protested that

some of the information was allegedly obtained in violation of his right to privacy and said as well that at least some of the bets were placed by someone else who had access to his account. (Doc. 88, Ex. 20 at 3-4).  On February 29, 2008, Bratschi rendered a decision which fined Luzzi $50,000 and suspended him for 200 days. (Doc. 88, Ex. 21 at ¶ 72).  Luzzi attempted to appeal to the CAS, but his appeal was rejected for failure to submit a brief in accordance with the CAS's  procedural requirements. (Doc. 88, Exs. 22, 23).

Also on October 9, 2007, Starace was notified of an ATP Anti-Corruption proceeding against him for wagering. (Doc. 88, Ex. 24).  Through counsel, Starace contacted Bratschi and admitted to having placed bets on tennis matches.  Starace proposed, with the agreement of ATP, a six week suspension and a fine of $30,000. (Doc. 88, Ex. 25).  On December 21, 2007, Bratschi issued a decision that confirmed the agreement and foreclosed the possibility of appeal. (Doc. 88, Ex. 26 at 2).

Bracciali was notified of proceedings against him for wagering on tennis on October 18, 2007.  (Doc. 88, Ex. 27).  Like Starace, Bracciali admitted to having placed bets and contacted Bratschi through his counsel to present a settlement he had negotiated with ATP. (Doc. 88, Ex. 28).  On December 21, 2007, Bratschi issued a decision confirming that Bracciali would pay a fine of $20,000 and serve a suspension of three months, with no right of appeal. (Doc. 88, Ex. 29 at 2).

This case arises out of Plaintiffs' dissatisfaction with these proceedings and the resultant sanctions, as well as the conduct of ATP that led up to them.  Plaintiffs seek a declaration as to whether they were bound to the ATP's rules against wagering and whether the resolution of their cases was binding.  Plaintiffs also claim that ATP breached the

6

fiduciary duties it owed to them as professional tennis players and seek damages for financial loss, psychological harms, and loss of goodwill and reputation.  (Doc. 1 at 22-28).

## II.   Discussion[3]

ATP's motion for summary judgment focuses on Plaintiffs' participation in the ATP's arbitration proceedings.  This Court will apply Delaware law to determine the legal effect of the arbitration proceedings.[4]  Delaware has adopted the Uniform Arbitration Act.  Del. Code Ann. tit. 10, §§ 5701-5725 (2011).

Delaware law provides that a party cannot challenge the validity of an arbitration provision unless the party either did not participate or raised an objection at the time of arbitration.  § 5714(a)(5).  Nor can a party challenge the procedure by which an arbitration was run if the party "continued with the arbitration with notice of the defect and without

_____

[3] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine, material factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotation marks omitted).  Judgment should enter against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation marks omitted).  "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995).

[4] ATP asserts that under their Rulebook, to which they allege Plaintiffs are bound, Delaware law supplies the substantive law of decision. (Doc. 87 at 8).  Plaintiffs also cite Delaware law at times and do not anywhere object to the use of Delaware law. (See, e.g., Doc. 114 at 18) ("Delaware law is clear on this point . . .").

objection." § 5714(a)(4). Even in a case where there was no explicit arbitration term, a Texas court, interpreting the Uniform Arbitration Act, found that because the parties had acted as if they had an agreement and because they had participated in arbitration, they were bound to the results. Massey v. Galvan, 822 S.W.2d 309 (Tex. Ct. App. 1992). Plaintiffs do not cite a single case which says otherwise. "Over time . . . the judicial view of arbitration has evolved from hostility to eager acceptance." Graham v. State Farm Mut. Auto. Ins. Co., 565 A.2d 908, 910 (Del. 1989). Thus, this Court will not lightly disregard the results of these prior arbitration proceedings in which Plaintiffs participated with the assistance of counsel and without contemporaneous objection.

However, Plaintiffs claim that the entire ATP process was flawed, from the initial agreement committing them to arbitration to the methods by which arbitration was conducted, and that an indictment of the whole process is therefore appropriate and not foreclosed by the result of the arbitration proceedings. There are four questions that arise from Plaintiffs' argument: First, were the prior proceedings arbitrations? Second, if Plaintiffs did not understand their contract with ATP, does that excuse them from being bound? Third, do Plaintiffs' claims attack the prior proceedings directly, or do they stand apart as separate claims against ATP which may be litigated on the merits despite the prior proceedings? Fourth, in the event that Plaintiffs do merely attack the prior proceedings, may they do so now?

A.    Character of the Prior Proceedings

Plaintiffs argue that the ATP proceedings ought not be treated as arbitrations because they lack the fairness of true arbitrations. (Doc. 114 at 21-22). They say that Kuhn

8

Construction, Inc. v. Diamond State Port Corp., suggests that Bratschi, who was appointed by the ATP President and compensated by ATP, was not an arbitrator or part of an arbitration process. 990 A.2d 393 (Del. 2010); (see Doc. 89, Ex. C at 7.05(E)(1)) (describing the procedures to select and responsibilities of a hearing officer). Kuhn held that an agreement to "referee" questions arising under the agreement using a designee of one of the contracting parties was not an agreement to arbitrate. However, in that case, defendant's "failure to include the express term[, arbitration,] (having struck the arbitration clause common in the industry), coupled with other ambiguities, could [have led plaintiff] reasonably to conclude that [defendant] had elected to forego arbitration of claims." Kuhn, 990 A.2d at 397. Here, the Rulebook unambiguously commits all disputes "arising out of the application of any provision of this Rulebook" to "arbitration." (Doc. 89, Ex. C at 7.06(A)); (see also, Doc. 114 at 15-16). Even though Bratschi was designated a "Hearing Officer" rather than an arbitrator, the Delaware Supreme Court said in Kuhn, "[w]e do not require the magic word, 'arbitration,' to find that the parties intended to arbitrate." 990 A.2d at 397.

Moreover, Kuhn is distinguishable on its facts. In Kuhn, "[t]he executive director [of defendant] asserted the authority to call the meeting under the referee clause. [Plaintiff] immediately objected, claiming that the executive director [did] not have authority to arbitrate claims under the referee clause or the Delaware Uniform Arbitration Act." Kuhn, 990 A.2d at 395. Plaintiffs here, far from immediately objecting and pursuing an action in court, participated, with the full advice of counsel, in the ATP proceedings without challenging the bona fides of Bratschi or the validity of the proceedings as a whole. (See Doc. 88, Exs. 15

at ¶ 32, 21 at ¶ 33).[5]

Though the Plaintiffs now spend much argument on the alleged problems with the proceedings before Bratschi, Plaintiffs fail to account for their additional rights to proceedings before the CAS.  While the CAS proceedings were denominated an "appeal," they were actually an entirely de novo proceeding. (Doc. 89, Ex. E at R57).  New issues could be argued, new discovery could be sought, new evidence could be presented, and, instead of a hearing officer, the cases would be argued to a panel of three arbitrators: one appointed by ATP, one appointed by the player and one member of the CAS. Id. at R48, R50, R53-54, R57.  Indeed, Di Mauro took this option and obtained some relief; Luzzi took this option but failed to comply with the procedural requirements of the CAS; and the other Plaintiffs chose, with the advice of counsel, not to further contest the Bratschi decision in their cases.  (Doc. 88, Exs. 9, 15, 22-29).  When the Court twice asked Plaintiffs at oral argument why any problems they alleged with Bratschi and the initial proceeding were not rendered moot by the right to a de novo review before the CAS, Plaintiffs had no answer.  The proceedings before Bratschi, along with the right to de novo review by the CAS, were indeed "arbitrations"

_____

[5] The remaining cases cited by Plaintiffs, Morris v. New York Football Giants, Inc., 575 N.Y.S.2d 1013, 1016-17 (N.Y. Sup. Ct. 1991) and NFL Players Association v. NFL, 598 F. Supp. 2d 971, 980 (D. Minn. 2008) are likewise distinguishable.  The court in Morris merely granted a motion to appoint a neutral arbitrator before arbitration proceedings had commenced.  575 N.Y.S.2d at 1016-17.  Moreover, in NFL Player's Association, the court found, in the context of ruling on a motion for a preliminary injunction, that there was a "substantial question" as to whether a NFL arbitration award could be vacated under the Federal Arbitration Act due to the alleged bias of the arbitrator.  598 F. Supp. 2d at 979. Neither these cases nor any other cases cited by Plaintiffs indicate that there is any statutory basis to attack an arbitration decision due to the bias of the arbitrator other than a timely filed motion to vacate.

under Delaware law and they are entitled to the legal force accorded to arbitrations.[6]

B.   Enforceability of the Arbitration Provisions

Plaintiffs argue that the consent forms which bound them to the Rulebook and, in turn, to arbitration, should not be enforced because they were contracts of adhesion.  However, even if the circumstances under which the Plaintiffs signed the consent forms or the terms of the agreements themselves were egregious enough to make the agreements qualify as contracts of adhesion, this does not end the inquiry.  The Delaware Supreme Court has held:

> The fact that a contract is adhesive does not give rise to a presumption of unenforceability. The adhesion factor is an aid in contract interpretation. If there is an ambiguity in the terms of the contract, that ambiguity will be resolved against the party who drafted the contract.

Graham, 565 A.2d at 912 (citing E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1114 (Del. 1985)).  Thus, a contract of adhesion is not automatically unenforceable.

Moreover, although "[a] contract of adhesion may be declared unenforceable, in whole or in part, if its terms are unconscionable," id. at 912,  Plaintiffs do not allege that the requirement to arbitrate is unconscionable.  They do allege that they suffered as a result of Bratschi's alleged bias, but not that the mere term requiring arbitration was "so one-sided as

---

[6] Although the argument is not directly raised by Plaintiffs, all Plaintiffs, including Starace and Bracciali, who settled with ATP and then presented that settlement to Bratschi for approval, have arbitrated.  See Sanders v. Grand Union Co., 541 F. Supp. 621 (M.D. Fla. 1982), aff'd sub nom. Rogers v. Lockheed-Georgia Co., 720 F.2d 1247, 1250 (11th Cir. 1983); see also, Bolden v. Se. Pa. Transp. Auth., 953 F.2d 807, 825-26 (3d. Cir. 1991) (holding that a grievance settlement was equivalent to an arbitration decision); Amalgamated Meat Cutters and Butcher Workmen v. M. Feder & Co., 234 F. Supp. 564, 567 (E.D. Pa. 1964) ("The important policy considerations which favor the early settlement of labor disputes without outside interference would be frustrated if settlement agreements reached in the grievance process were refused enforcement unless incorporated in a formal arbitrator's award . . . .").

to be oppressive." Tulowitzki v. Atl. Richfield Co., 396 A.2d 956, 960 (Del. 1978).  In fact, with respect to their right to de novo review by the CAS, Plaintiffs have not alleged that proceedings before that body were (or would have been) deficient in any way.

Plaintiffs also contend that they were not contractually bound to arbitration because "the manner and means in which the consent forms were presented for their signatures as well as the content of such forms prevented the parties from coming to a meeting of the minds concerning the material terms of the official rulebook." (Doc. 114 at 9).  As the Delaware Supreme Court has explained, however, a "party to a contract cannot silently accept its benefits and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance." Graham, 565 A.2d at 913.[7]  Because Plaintiffs accepted the benefits of the bargain of playing ATP events (including accepting prize money) after signing an agreement to be bound by the Rulebook, they may not now be heard to complain about the Rulebook's arbitration provision.  Moreover, even if the agreement to arbitrate had not been binding, "a party may waive its right to challenge an arbitrator's authority to decide a matter by voluntarily participating in an arbitration and failing to object on the grounds that there was no agreement to arbitrate." Millennium Validation Servs., Inc. v. Thompson, No. 02-1430, 2006 WL 3159821, at *5 (D. Del. Nov. 3, 2006); see also, e.g.,

---

[7]  The Third Circuit has explained that "while mutual assent is sometimes referred to as a meeting of the minds, this phrase must not be construed too literally.  Acceptance is measured not by the parties' subjective intent, but rather by their outward expressions of assent." Morales v. Sun Constructors, Inc., 541 F.3d 218, 221 (3d Cir. 2008) (quotations omitted); see also Grasso v. First USA Bank, 713 A.2d 304, 308 (Del. Super. Ct. 1998).  In the absence of fraud, a party who signs a contract is thus bound regardless of whether he read the contract or even understood the language in which it was written. Morales, 541 F.3d at 221-22.

United Indus. Workers v. Gov't of the Virgin Islands, 987 F.2d 162, 168-69 (3d Cir.1993);

Massey, 822 S.W.2d at 315 (applying the Uniform Arbitration Act); Himco Sys., Inc. v.

Marquette Elecs., Inc., 407 N.E.2d 1013, 1016 (Ill. App. Ct. 1980) (same).

      C.     Relationship of Plaintiff's Claims to the Arbitration Decisions

Plaintiffs maintain that their action, styled as a two count declaratory judgment and

breach of fiduciary duty complaint, does not challenge the arbitration awards, but rather

indicts the entire relationship between the players and ATP.  However, a closer look at the

claims here establishes that this action is a de facto appeal from the underlying arbitration

decisions and settlements.  In Count I, Plaintiffs seek declaratory judgment as to:

> (i) whether a contract was formed between the [ATP] and the [Plaintiffs] based upon the Official Rulebook, the Consent Forms, and applicable law; [and] (ii) whether the [Plaintiffs] received a full and fair hearing concerning alleged violations of the Anti-Corruption Program . . . .

(Doc. 1 at ¶ 124).  In Count II, Plaintiffs allege ATP breached its fiduciary duties by:

> (i) seeking to contractually bind them to provisions of the Official Rulebook despite the content of the Consent Forms and the manner and means in which they were presented for execution; (ii) discriminately[sic] targeting them for selective enforcement of the Anti-Corruption Program; (iii) failing to give them a full and fair hearing for violations of the Anti-Corruption Program by utilizing an administrative hearing officer who was appointed by the President of the [ATP], permitting them to present witnesses, such as the [Administrator of Rules and Competition], who had very little personal knowledge of the underlying facts, depriving the [Plaintiffs] of their right to confront and cross-examine purported confidential informants and other witnesses with personal knowledge; . . . and (vi) imposing grossly disproportionate suspensions or fines to violations of the Anti-Corruption Program.

Id. at ¶ 134.[8]

---

[8] Count I(iii-iv) and Count II(iv-v) allege violations of privacy rights by ATP in obtaining information about Plaintiffs from gambling companies and the European Sports Security

Count II(vi) is a challenge to the arbitration awards.  It is impossible to conceive how this Court could find that Bratschi or the CAS had "impos[ed] grossly disproportionate suspensions or fines to violations of the Anti-Corruption Program" without effecting a review of those awards. (Doc. 1 at ¶ 134).  This is especially true when one considers that the players all admitted guilt and the only substantive issue in these arbitrations was the question of what penalty was appropriate. (Doc. 88, Exs. 3, 13, 19, 25, 28).  Furthermore, because the Rulebook prescribes the penalties, the matter of the appropriate penalty is a dispute arising out of terms in the Rulebook. (Doc. 89, Ex. C at 7.05(G)).

Count I(i) and Count II(i) challenge whether there was a contractual requirement to arbitrate. The lack of a valid arbitration agreement is specifically contemplated as a statutory ground for vacating an arbitration award.  Del. Code Ann. tit. 10, § 5714(a)(5).  These claims, therefore, essentially seek to vacate the arbitration awards.  Furthermore, the validity of the consent forms was given some attention during the arbitration proceedings and any decision by this Court would inevitably implicate those conclusions. (Doc. 88, Ex. 6 at ¶¶ 8, 14, 23-24, 29-31, Ex. 9 at ¶¶ 2.3, 2.7, 2.11, 2.12, 3.3, 4.3, 4.4, 9.4, 9.5, 9.7, Ex. 13 at 2, 4, Ex. 14 at 3,

---

Association.  Neither party spent any portion of their filed arguments addressing these claims and they were also not discussed at oral argument.  However, the Court briefly notes that the validity of evidence collected in alleged violation of the Plaintiffs' privacy rights was given some attention during the arbitration proceedings. (Doc. 88, Ex. 14 at 3, Ex. 15 at ¶¶ 7, 22, 36-38, Ex. 21 at 24, Ex. 22 at 2) (addressing the issue of evidence allegedly obtained in violation of certain privacy rights of Plaintiffs).  Even if these issues somehow avoided preclusion because of the prior arbitrations, it is not clear from Plaintiffs' Complaint or any of the filings in this case exactly what privacy right Plaintiffs believe has been violated and it is therefore impossible for this Court to hold that Plaintiffs have made "a showing sufficient to establish the existence of [this] element essential to [Plaintiffs'] case . . . ." Celotex Corp., 477 U.S. at 322.

Ex. 15 at ¶¶ 7-8, 11-12, 43-44, 47-54, Ex. 19 at 2, Ex 20 at 3, Ex. 21 at ¶¶ 7-8, 11-12, 20, 44-46, 49-54) (discussing barriers to players understanding rules and consent forms).

Count I(ii) and Count II(iii) contest the manner in which the arbitration was conducted. However, the misuse of arbitrator power and failure to follow procedures are also specifically contemplated as statutory grounds for vacating an arbitration award.  § 5714(a)(3)-(4). Furthermore, if the manner in which Bratschi was appointed and compensated was perceived as wrongful, Plaintiffs, with the assistance of counsel, could have looked at the provision in the Rulebook that provided for that appointment and challenged it at the time of arbitration. (Doc. 89, Ex. C at 7.05(E)(1)).  Plaintiffs, however, failed to do so. (Doc. 88, Ex. 15 at ¶ 32, Ex. 21 at ¶ 33).

At oral argument Plaintiffs also argued that there was an undisclosed attorney-client relationship between Bratschi and ATP.[9]  Assuming that there was such a past relationship, Delaware courts have held that an attorney-client relationship between an arbitrator and party would be an instance of "evident partiality" and would be a ground for vacating the award under title 10, section 5714(a)(2) of the Delaware Code. Beebe Med. Ctr., Inc. v. InSight Health Servs. Corp., 751 A.2d 426, 432-33 (Del. Ch. 1999).  Delaware courts have thus found that such a relationship is not an excuse to void the arbitration requirement and sue in court for damages; instead it may be used to attack the award itself within the confines of the Delaware law governing arbitrations.  Finally, as a matter of common sense, it is hard

---

[9] For summary judgment purposes, the Court accepts that prior to his appointment as the ATP Hearing Officer, Bratschi had briefly provided legal advice to the ATP on its Anti-Corruption Program.

to see how the Court could reconsider whether Plaintiffs had a "full and fair hearing" (as Plaintiffs' Complaint requires) without being asked to review the awards. (Doc. 1 at ¶¶ 124, 134).

Count II(ii) alleges that ATP breached its fiduciary duty in unfairly enforcing the anti-gambling provisions against Plaintiffs and not other, higher ranked, players.  However, questions concerning enforcement of the rule prohibiting gambling, which appears in the Rulebook, are disputes "arising out of the application of [a] provision of [the] Rulebook" and thus are subject to the Rulebook's arbitration clause. (Doc. 89, Ex. C at 7.06(A)).  Moreover, in his proceeding before the CAS, Plaintiff Di Mauro raised the concern, among others, "that an exemplary sanction is never a just sanction." (Doc. 88, Ex. 9 at ¶ 3.6).  At the CAS hearing, ATP also introduced evidence of the sanctions given to other players. (Id. at ¶¶ 5.3-5.4.)  The CAS compared Di Mauro to other players who had been punished and concluded, with a brief discussion of the purposes of punishment, that Di Mauro's sanction was too severe and reduced Bratschi's proposed sanction (a result Di Mauro accepted). (Id. at ¶¶ 9.13-9.17.)  In short, Di Mauro's case proves that questions about differing treatment among players whom ATP investigated were questions fit for consideration at arbitration.

Thus, despite Plaintiffs' creative labeling, they cannot avoid the truth about what this action really is—an attempt to relitigate the decisions and settlements reached in the arbitration proceedings.  This case is readily distinguishable from Brown v. NFL, 219 F. Supp. 2d 372, 379-82 (S.D.N.Y. 2002), relied on by Plaintiffs.  In Brown, a NFL player filed suit after being poked in the eye with a penalty flag thrown by an official employed by the NFL. Id. at 375.  Because the official's duty to refrain from negligence was separate from

the player's collective bargaining agreement, the court found that the arbitration provision contained therein was inapplicable. Id. at 379-82.  Here, however, even if the ATP owed any fiduciary duties to the players—an issue the Court need not reach—any such duties would have arisen from their contractual relationship rather than a separate and distinct source of law, as in Brown.

Furthermore, in Brown, the NFL sought dismissal of a pending court action in favor of an order requiring the parties to arbitrate and failed because the player had alleged a separate tort.  Id. at 377.  In this case, Plaintiffs have already arbitrated to conclusion and now seek a path around a standing arbitration award by trying to allege a breach of fiduciary duty.  This they cannot do.

Plaintiffs have cited no authority that would allow them to seek the type of declaratory judgment or relief for breach of fiduciary duty that they attempt to assert here.  Each of Plaintiffs' claims in this lawsuit either was raised and decided or could have been raised at the time of the arbitrations.  Any decision by this Court would, of necessity, intrude upon the ground already trod by the arbitrations.  Since this Court "may not consider or pass upon the merits of claims submitted to an arbitrator," the remaining question then, is whether this Court should, treating these claims as attacks upon the arbitration decisions themselves, vacate or modify the decisions.  Mansoory v. SC & A Constr., Inc., No. 3920-VCP, 2009 WL 2140030, *3 (Del. Ch. July 9, 2009), aff'd, 988 A.2d 937 (Del. 2010).

D.    Statutory Bars to Vacating and Modifying Arbitration Awards

At oral argument, Plaintiffs disclaimed that they were seeking traditional judicial review of the arbitration decisions.  Maybe this should end the matter.  However, for completeness,

17

the Court will briefly address this possibility.

Under Delaware law, an arbitration award can be modified upon a showing that:

(1) There was an evident miscalculation of figures or an evident mistake in the description of any person, thing or property referred to in the award;

(2) The arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted; or,

(3) The award is imperfect in a matter of form, not affecting the merits of the controversy.

Del. Code Ann. tit. 10, § 5715(a)(1)-(3) (2010).  None of these grounds are alleged by Plaintiffs here and furthermore, a "Court shall modify or correct the award" only "[u]pon complaint or on application in an existing case made within 90 days after delivery of a copy of the award to the applicant." § 5715(a).  In this case, the latest date on which any of the Plaintiffs received a final determination of their claims under the arbitration procedure set out in the Rulebook was June 11, 2008, the date of Di Mauro's CAS decision. (Doc. 88, Ex. 9). The present action was filed on July 13, 2009 (Doc. 1), more than a year later.  This exceeds 90 days by a considerable margin.

The remaining option is for this Court to vacate the award.  Under Delaware law, a court may vacate an arbitration award where:

(1) The award was procured by corruption, fraud or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral except where the award was by confession, or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers, or so imperfectly executed them that a final and definite award upon the subject matter submitted was not made;

18

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor, or refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of § 5706 or failed to follow the procedures set forth in this chapter, so as to prejudice substantially the rights of a party, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection; or

(5) There was no valid arbitration agreement, or the agreement to arbitrate had not been complied with, or the arbitrated claim was barred by limitation and the party applying to vacate the award did not participate in the arbitration hearing without raising the objection . . . .

§ 5714(a).[10]  At oral argument Plaintiffs disclaimed any allegation that fraud, corruption or undue means played a role in the arbitration decisions about which they now complain.  With corruption, fraud, and undue means off the table, the time bar is firm.  "An application under this section shall be made within 90 days after delivery of a copy of the award to the applicant . . . ." § 5714(b).  Since the last notice of an arbitration decision was sent on June 11, 2008 and this action was not commenced until July 13, 2009, the delay in filing after receipt of the arbitration decisions means any challenge is barred by the statute of limitations. (Docs. 1; 88, Ex. 9).

## III.    Conclusion

Each of these professional athletes admitted to betting on their sport.  When the ATP proposed adjudicating their cases through the arbitration process established by the ATP Rulebook, each Plaintiff, represented by his own independent counsel, participated in that

---

[10] In addition to the statutory criteria, Delaware courts do in very rare circumstances vacate awards which are manifestly wrong. Travelers Ins. Co. v. Nationwide Mut. Ins. Co., 886 A.2d 46 (Del. Ch. 2005) (vacating an award made notwithstanding the fact that a settlement disposing of the dispute had occurred prior to the date of arbitration).  This is not such a case.

arbitration process without objection.  The arbitration process, which included the right to de novo review by the independent Court of Arbitration for Sport, met all of the requirements of Delaware law.  None of the Plaintiffs sought the limited court review of arbitration decisions allowed by Delaware law.  Instead, they seek by this action to raise issues which they either litigated or should have litigated at the time the arbitration proceedings were occurring.  As a matter of law, they may not do so.

Accordingly, it is hereby

**ORDERED**:

1.  Defendant's Motion for Summary Judgment (Doc. 87) is **GRANTED** on all claims and counts of the Complaint (Doc. 1).

2.  The Clerk shall enter judgment in favor of ATP Tour, Inc. and against  Plaintiffs, Giorgio Galimberti, Alessio Di Mauro, Potito Starace, Daniele Bracciali and Francesca Luzzi, as personal representative of the estate of Federico Luzzi.

3.  The file will remain open to complete a decision on the intervenor's Motion to Unseal Certain Documents. (Doc. 124).  In light of the Court's decision, the Court will allow intervenor ESPN  (at its option) to file a supplemental brief of no more than five pages, with defendant ATP Tour, Inc. permitted to file a supplemental response of the same length. ESPN's supplemental brief is due by **March 24, 2011**; defendant's response is due by **April 14, 2011**.

**DONE AND ORDERED** at Jacksonville, Florida this 1st day of March, 2011.


TIMOTHY J. CORRIGAN
United States District Judge

bt.
Copies:

counsel of record

21